UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DONALD STOWELL,

                                    Plaintiff,

v.                                                    6:02-CV-0665
                                                      (TJM/GHL)

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

---

APPEARANCES:                                  OF COUNSEL:

CONBOY, MCKAY, BACHMAN & KENDALL, LLP          LAWRENCE D. HASSELER, ESQ.
Attorneys for Plaintiff
407 Sherman Street
Watertown, New York 13601-9990

HON. GLENN T. SUDDABY                          WILLIAM H. PEASE, ESQ.
United States Attorney for the                 Assistant United States Attorney
  Northern District of New York
Attorney for Defendant
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

GEORGE H. LOWE, United States Magistrate Judge

## REPORT AND RECOMMENDATION

      This matter was referred to me for report and recommendation by the Honorable Thomas

J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern

District of New York Local Rule 72.3.

**TABLE OF CONTENTS**

I.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  Plaintiff's Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Evaluation of Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Scope of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  THE EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  Hearing Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  November 3, 1999 Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.  Appeals Council's Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.  March 8, 2001 Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  Medical Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.  Sateesh K. Goswami, M.D. (Treating Physician) . . . . . . . . . . . . . . . . . . . . 10

            a.  RFC Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

               i.  September 4, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

               ii.  November 1, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

               iii.  March 20, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            b.  Office Visits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.  Massena Memorial Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            a.  Emergency Room Visit – July 26, 1998 . . . . . . . . . . . . . . . . . . . . . 14

            b.  Emergency Room Visit – March 22, 1999 . . . . . . . . . . . . . . . . . . . 16

i

3.  Judith Bodnar, M.D. and Alan Auerbach, M.D. . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A.  Duty to Develop the Record and Residual Functional Capacity . . . . . . . . . . . . . . . 17

B.  Treating Physician  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.  Pain/Credibility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D.  Past Relevant Work  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.  REMAND OR REVERSAL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.      BACKGROUND

A.      Procedural History

Plaintiff filed an application for disability insurance benefits on November 3, 1998.

(Administrative Transcript ("T") at 115, 116.)  The application was denied initially and upon

reconsideration.  (T. at 90, 91, 93-96.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held

on November 3, 1999.  (T. at 27-48.)  On January 11, 2000, the ALJ issued a decision finding

that plaintiff was not disabled.  (T. at 212-217.)  Plaintiff appealed to the Appeals Council, and

on September 29, 2000, the matter was remanded to an ALJ to obtain further information

regarding plaintiff's treating physician's November 1, 1999 report which stated that plaintiff was

unable to perform sedentary work.  (T. at 223-225.)

A second hearing was held before another ALJ on March 8, 2001.  (T. at 49-89.)  On July

26, 2001, the ALJ found that plaintiff was not disabled at any time through the date of the

decision.  (T. at 15-22.)  The ALJ's decision became the final decision of the Commissioner

when the Appeals Council denied plaintiff's request for review on April 9, 2002.  (T. at 6-7.)

Plaintiff then commenced the instant action.  (Dkt. No. 1.)

B.      Plaintiff's Contentions

Plaintiff makes the following claims:

(1) The ALJ failed to properly consider, evaluate, and give controlling weight to the

opinions of plaintiff's treating physician.  (Dkt. No. 5 at 13-17.)

(2) The ALJ erred in finding that plaintiff's statements regarding pain were not credible.

(Dkt. No. 5 at 17-22.)

1

(3) The ALJ failed to adequately develop the record.  (Dkt. No. 5 at 22-23.)

(4) The ALJ erred in finding that plaintiff could perform his past relevant work.  (Dkt. No. 5 at 23-25.)

## II.    APPLICABLE LAW

### A.    Evaluation of Disability

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2004).[1]  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

42 U.S.C. § 1382c(a)(3)(B) (2004).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  20 C.F.R. §§ 404.1520, 416.920 (2005). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

---

[1]  As of September 25, 2003, revisions were made to certain sections of the Code of Federal Regulations; the revisions, however, have no effect on the outcome of this Report and Recommendation.

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R. §§] 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.[] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.[] [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

*Barnhart v. Thomas*, 540 U.S. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Serrano v. Barnhart*, Civ. No. 02-6372, 2003 WL 22683342, at *11 (S.D.N.Y. Nov. 14, 2003). If the plaintiff-claimant meets his or her burden of proof on all four steps, the burden then shifts to the defendant-Commissioner to prove that the plaintiff-claimant is capable of performing other jobs which exist in significant numbers in the national economy. *Id.* (citing *Barnhart v. Thomas*, 540 U.S. at 25; other citations omitted).

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.

*Brown v. Barnhart*, Civ. No. 02-4523, 2003 WL 1888727, at *4 (S.D.N.Y. Apr. 15, 2003);

*Serrano v. Barnhart*, 2003 WL 22683342, at *10; *Rosado v. Sullivan*, 805 F. Supp. 147, 153

(S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing

court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards

were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817

F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports the

decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

 A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the decision.  42

U.S.C. § 405(g) (2005); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial

evidence has been defined as 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258

(2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered

throughout the administrative record.  *Serrano*, 2003 WL 22683342, at *10; *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197

(1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts

from its weight."  *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its

interpretation of the administrative record for that of the Commissioner if the record contains

substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.

1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

**III.     THE EVIDENCE**

      **A.     Hearing Testimony**

            **1.     November 3, 1999 Hearing**

At plaintiff's first hearing before an ALJ on November 3, 1999, plaintiff testified that he had experienced difficulty breathing for the past several years. (T. at 35-36.) As an example, plaintiff explained that while he was still employed, he had to park in a lot which was "a couple of football fields across" to the plant where he worked. (T. at 36.) While walking to the plant, plaintiff stated he would have to stop two or three times to catch his breath. (*Id.*)

Plaintiff stated that he smoked one pack of cigarettes a day for approximately thirty years and also acknowledged that his physician had advised him to stop or reduce his smoking. (T. at 36-37.) However, plaintiff testified that he believed that smoking induced him to cough, which helped him cough up phlegm; in other words, according to plaintiff, if he did not smoke, he would not cough up phlegm, and the phlegm would "fill up [his] lungs and make it that much harder to breathe." (T. at 37.)

Plaintiff also stated he experienced headaches, which may be associated with plaintiff's breathing problems. (T. at 38.) Plaintiff testified he suffered from daily headaches and experienced shortness of breath several times during the day. (*Id.*) Any form of physical activity brought on shortness of breath; for example, plaintiff stated he could not walk to and from his mailbox (approximately fifty yards) without stopping. (T. at 41.) Plaintiff also stated he could not lift his granddaughter, who weighed ten pounds, because he would feel faint and dizzy. (*Id.*) However, plaintiff stated he was able to attend to his personal needs (*e.g.*, he could dress and

5

bathe himself, eat on his own, brush his teeth, trim his moustache, and comb his hair).  (T. at 41.)

Regarding housework, plaintiff stated he did "light cooking" and was able to vacuum, but needed to take breaks.  (T. at 42.)  Plaintiff also stated he put dishes away, but did not wash the dishes because he "just never washed dishes."  (*Id.*)  He also assisted his wife with the grocery shopping and putting the groceries away, and also helped his wife by bringing the laundry to her. (T. at 42-43.)  Plaintiff also testified that he owned a riding mower, which he used to mow his one acre lot.  (T. at 43.)  Plaintiff stated it took him approximately three days to mow the entire lot because he would mow until he found it hard to breathe, then resume mowing the next day. (*Id.*)

Upon being asked by his attorney, plaintiff clarified an earlier statement and said that he was able to dress himself, but had to take breaks when putting his shoes on, *i.e.*, he would put his shoes on, then have to wait a few minutes prior to tying them.  (T. at 46.)  Also upon being asked, plaintiff stated he also experienced chest pains when it was difficult for him to breathe. (*Id.*)  He claimed he experienced the chest pain five to six times a day, and that the pain lasted for approximately two minutes.  (*Id.*)

### 2.    Appeals Council's Ruling

On January 11, 2000, the ALJ issued a decision finding that plaintiff was not disabled. (T. at 212-217.)  Plaintiff requested review by the Appeals Council and on or about September 29, 2000, the Appeals Council vacated the ALJ's decision because it did not contain an evaluation of Dr. Goswami's November 1, 1999 residual functional capacity assessment ("RFC Assessment") and of Dr. Bodnar's February 11, 1999 RFC Assessment, as affirmed by Dr. Auerbach on April 9, 1999.  (T. at 224.)  Furthermore, the Appeals Council concluded that

6

"further development" from Dr. Goswami was required to support the opinions contained in his November 1, 1999 RFC Assessment.  (*Id.*)

Upon remand, the Appeals Council directed the ALJ to give "further consideration to the treating source's opinion . . . and the nonexamining source's opinion . . . and explain the weight given to such opinion evidence.  As appropriate, the [ALJ] may request the treating and examining sources to provide additional evidence and/or further clarification of the opinion and medical source statements about what the claimant can still do despite the impairment."  (T. at 224-225.)

### 3.    March 8, 2001 Hearing

After the Appeals Council remanded plaintiff's case, a second hearing was held on March 8, 2001 before an ALJ different than the one who had presided at the first hearing.  (T. at 49.)  At the outset of the hearing, the ALJ acknowledged that he understood the primary basis for the Appeals Council's remand, *i.e.*, "to make sure that [plaintiff had] every opportunity to present whatever supporting evidence Dr. Goswamee [sic] used to come to his opinions."  (T. at 52.)  Apparently the ALJ and plaintiff's counsel had an off the record discussion prior to the commencement of the hearing.  (T. at 53.)  It was agreed to "leav[e] the record open for a few weeks to get an updated RFC and additional medical . . . in response to the direction of . . . Appeals Council."  (T. at 54.)[2]

Following this discussion the ALJ elicited certain information from plaintiff.  Plaintiff stated he worked for a company named True Stitch from 1981 to 1997.  (T. at 59.)  His last day

_____

[2]  Consistent with this agreement, an updated RFC Assessment by Dr. Goswami, dated March 20, 2001, was submitted.  (T. at 247-251.)  However, as is more fully discussed below at 17-20, the ALJ failed to even mention this RFC Assessment in his July 26, 2001 decision.

of employment was November 25, 1997, which is coincidentally the same day he claims he

became disabled (T. at 116).[3]   (T. at 60.)  Plaintiff states that in the last few years he was working

at True Stitch, he had experienced breathing problems and was diagnosed with asthma and

emphysema.  (*Id.*)  However, plaintiff clearly states that he did not stop working because of any

traumatic event (*e.g.*, an accident on the job), rather he stopped working because the plant closed.

(T. at 60.)  In fact, plaintiff stated that but for the closing he "would have probably worked there

and died there."[4]   (*Id.*)

      Plaintiff described his job at True Stitch as a "standing up job" meaning that he would

stand for the majority of the day, except for two twenty minute breaks and a thirty minute lunch

break.  (T. at 61.)  His job did not require him to lift heavy items; the heaviest thing he lifted

during a normal work day weighed approximately two pounds.  (*Id.*)

      Plaintiff considered his breathing to be the most serious medical condition that restricts

him from engaging in any substantial gainful activity.  (T. at 62.)  He was diagnosed with asthma

and emphysema and, as a result, experienced shortness of breath and dizziness upon physical

exertion.  (T. at 62-63.)

      Plaintiff has been treated by Sateesh K. Goswami, M.D. since 1998.  (T. at 67.)  At the

hearing, plaintiff testified that Dr. Goswami examined him every two or three months to check

his blood pressure and lungs.  (T. at 68.)  Plaintiff also stated he visited the emergency room

---

[3]  In other words, plaintiff's last day of employment is also the alleged onset date.

[4]  This is further evidenced by plaintiff's disability report, which was signed on October 19, 1998.
(T. at 122-131.)  In the report, plaintiff was asked when he stopped working, to which he replied that his
last day of work was November 25, 1997.  (T. at 123.)  When asked why he stopped working, plaintiff
wrote "Plant Closed."  (*Id.*)

8

twice in the five years prior to the hearing, but was not admitted to the hospital on either occasion.[5]  (T. at 68-69.)

At the hearing, plaintiff claimed he was able to sit and stand for ten to fifteen minutes at a time; walk for ten minutes at a time; and lift five pounds, but was not able to carry it for any significant distance.  (T. at 71-72.)  Plaintiff stated he was unable to push or pull anything more than five pounds, and as an example, plaintiff stated he could not push his granddaughter in her stroller.  (T. at 72.)  Plaintiff cited his difficulty breathing as the reason for his inability to physically exert himself.  (T. at 73.)

Plaintiff further stated that while he could bend forward at the waist, stoop down to tie his shoes, crouch under a table, kneel, crawl and climb stairs, he would not attempt to climb a small ladder or a step ladder because he was "afraid of the shortness of breath and dizziness."  (T. at 73-74.)  Plaintiff also stated that his shortness of breath caused pain in his shoulder and chest area, which he was told was attributable to his difficulty breathing.  (T. at 75-76.)

Although at the first hearing plaintiff testified that he did "light cooking" and did not wash dishes because he "just never washed dishes," (T. at 42) at the second hearing plaintiff testified that he was unable to do any cooking or wash dishes because of "the fumes" which aggravated his breathing.  (T. at 80-81.)  He also stated he was unable to do laundry because of the fumes of the detergent, unable to dust because dust causes shortness of breath, and unable to sweep because the back and forth motion caused pain in his shoulder and chest area.  (T. at 81-82.)  Pushing a vacuum also caused shortness of breath, dizziness, and pain.  (T. at 82.)

---

[5]  Although at the hearing plaintiff stated that he stayed in the emergency room overnight, the Administrative Transcript indicates that he was at the hospital from 11:54 p.m. to 3:40 a.m. (T. at 152) on July 26, 1998, and from 2:30 p.m. to 4:10 p.m. on March 22, 1999 (T. at 197).

Plaintiff testified that a month and a half prior to the second hearing, he quit smoking.  (T. at 85.)

**B.      Medical Evidence**

     **1.      Sateesh K. Goswami, M.D. (Treating Physician)**

         **a.      RFC Assessments**

             **i.      September 4, 1998**

Dr. Goswami completed a form in which he stated that he last examined plaintiff on September 4, 1998.[6]  (T. at 176-179.)  The Court notes that the form is unsigned, undated, and incomplete, as page one of the form is missing from the record.[7]  (T. at 176-179.)  Dr. Goswami's treating diagnosis was moderately severe chronic obstructive pulmonary disease ("COPD").  (T. at 178.)  When asked about plaintiff's history, present symptoms, nature, frequency and duration of respiratory distress episodes, Dr. Goswami wrote "improved dyspnea"[8] and provided no further details.  (T. at 179.)  Plaintiff did not have any symptoms of wheezing, rales, or clubbing[9]. (T. at 176.)  When asked about plaintiff's ability or inability to perform work-related physical

---

[6]  The Court notes that the form is unsigned, however Dr. Goswami's name appears at the bottom of each page.  Furthermore, although this form is not identical to the subsequent RFC Assessment forms completed by Dr. Goswami, it asks the same questions regarding a claimant's ability to perform work-related activities.

[7]  The Court also notes that the pages are out of order, as contained in the Administrative Transcript.  Page four of five appears first, followed by page five, then page two, and page three.  (T. at 176-179.)  Page one does not appear to be part of the record.

[8]  Dypsnea is defined as "breathlessness or shortness of breath; difficult or labored respiration."  Dorland's Illustrated Medical Dictionary 578 (30th ed. 2003).

[9]  Clubbing is defined as "a deformity produced by proliferation of the soft tissues about the terminal phalanges of the fingers or toes, with no constant osseous changes; seen in various types of chronic disease of the thoracic organs."  Dorland's Illustrated Medical Dictionary 379 (30th ed. 2003).

activities (*e.g.*, lifting and carrying, standing and/or walking, sitting, pushing and/or pulling), Dr. Goswami did not complete this part of the form; it was left blank.  (T. at 176-177.)

### ii.    November 1, 1999

On November 1, 1999, Dr. Goswami completed a RFC Assessment of plaintiff.  (T. at 190-194.)  Dr. Goswami's diagnosis was COPD with asthma and bronchitis and Dr. Goswami stated plaintiff's prognosis was "fair to poor" due to plaintiff's nicotine addiction.  (*Id.*)

Regarding plaintiff's ability to do work-related activities, Dr. Goswami stated that plaintiff could never lift or carry anything of any weight; however when asked to detail the medical findings that support this assessment, Dr. Goswami wrote nothing.  (T. at 191.)  Dr. Goswami also said that plaintiff's ability to sit and stand was affected by his impairment.  (T. at 192.)  Dr. Goswami opined that plaintiff could sit for two hours total (out of an eight hour workday) and further, that plaintiff could sit for two hours at one time without interruption.  (*Id.*)  However, plaintiff could only stand for less than one hour (in an eight hour workday).  (*Id.*)  Dr. Goswami did not indicate how long plaintiff could stand at one time without interruption, nor did Dr. Goswami indicate how long plaintiff could walk (in an eight hour workday) or walk at one time without interruption.  (T. at 192.)  Again, Dr. Goswami did not write anything when asked what medical findings supported his assessment.  (*Id.*)

Plaintiff's use of his hands and feet was also affected by his impairment, according to Dr. Goswami's assessment.  (T. at 192.)  Plaintiff could use his right and left hand "frequently" for simple grasping and fine manipulation, but not "continuously."  (*Id.*)  Plaintiff could also use his right and left foot "frequently."  (*Id.*)  Dr. Goswami did not list any medical finding to support his assessment.  (*Id.*)

11

Regarding plaintiff's postural activities, Dr. Goswami opined that plaintiff could never climb, balance, stoop, crouch, kneel, or crawl. (T. at 193.) Nor could plaintiff ever reach, handle, feel, push, or pull. (*Id.*) However, plaintiff could "continuously" hear and speak. (*Id.*) Again, Dr. Goswami did not list any medical findings to support his assessment. (*Id.*)

Finally, Dr. Goswami stated that plaintiff had restrictions regarding heights, moving machinery, chemicals, noise, humidity, dust, temperature extremes, fumes, and vibrations, however Dr. Goswami did not indicate whether Plaintiff should "avoid all exposure," "avoid even moderate exposure," or "avoid concentrated exposure." (T. at 194.) Dr. Goswami did state that an x-ray, pulmonary function test, and clinical exam supported his assessment but did not elaborate further. (*Id.*)

### iii.    March 20, 2001

On March 20, 2001, Dr. Goswami completed another RFC Assessment of plaintiff. (T. at 247-251.[10]) Dr. Goswami's diagnosis was COPD and shortness of breath. (T. at 247.) Plaintiff's prognosis was "fair" and plaintiff's response to treatment was noted as "good to fair." (*Id.*)

Regarding plaintiff's ability to do work-related activities, Dr. Goswami stated that plaintiff could not lift anything heavier than eleven pounds, but could "occasionally" lift objects up to ten pounds. (T. at 248.) However, Dr. Goswami opined that plaintiff could never carry anything of any weight. (*Id.*) Dr. Goswami also said that plaintiff's ability to sit and stand was affected by his impairment. (T. at 249.) Dr. Goswami opined that plaintiff could sit and stand for two hours total (out of an eight hour workday) and further, that plaintiff could sit and stand

---

[10]  A copy of this report appears at pages 252-256.

for fifteen minutes at one time without interruption.[11]  (*Id.*)

Dr. Goswami specifically stated that plaintiff could only walk for twenty-five yards at a time or for one hour total, out of an eight hour workday.  However, plaintiff could only walk for five minutes, at one time, without interruption.  (T. at 249.)  The doctor then wrote "rest – 3 hours" which this Court interprets as saying plaintiff needed to rest for three hours out of an eight hour work day.  (*Id.*)

Although in his previous RFC Assessment Dr. Goswami opined that plaintiff's use of his hands and feet was also affected by his impairment (T. at 192), in the more recent RFC Assessment, Dr. Goswami stated plaintiff's hands and feet were **not** affected and that he had "continuous" use of his hands and feet.  (T. at 249.)

Regarding plaintiff's postural activities, Dr. Goswami opined that plaintiff could never climb, balance, stoop, crouch, kneel, or crawl, based on plaintiff's COPD.  (T. at 250.)  Dr. Goswami also stated that plaintiff could never reach or handle, but could continuously feel, hear, and speak.  (*Id.*)  When asked about plaintiff's ability to push and pull, Dr. Goswami checked both the "never" box and the "continuously" box, so it is unclear which one he intended to check.  (*Id.*)

Finally, as he did in his previous RFC Assessment, Dr. Goswami opined that plaintiff had restrictions regarding heights, moving machinery, chemicals, noise, humidity, dust, temperature extremes, fumes, and vibrations, but Dr. Goswami again did not indicate whether Plaintiff should "avoid all exposure," "avoid even moderate exposure," or "avoid concentrated exposure."  (T. at

---

[11]  This is a marked decrease from Dr. Goswami's November 1, 1999 RFC Assessment, where he opined plaintiff could sit for two hours at a time without interruption.  (T. at 192.)

251.)  Dr. Goswami stated that an x-ray, pulmonary function test, and clinical exam supported his

assessment but did not elaborate further.  (*Id.*)

### b.    Office Visits

Plaintiff was examined by Dr. Goswami on March 9[12] and 23, 1999; April 5 and 9, 1999;

May 26, 1999; June 8, 1999; and July 6, 1999.[13]  (T. at 180, 181, 204-208.)  Dr. Goswami's notes

regarding these visits are similar – plaintiff complained of headaches, chest discomfort, and

shortness of breath; plaintiff continued to smoke, even though he was strongly advised to quit;

and plaintiff was diagnosed with COPD.  (*Id.*)

In 2000, plaintiff was also treated by Dr. Goswami on January 28, February 18, May 19,

October 10 and 24, November 16, and December 19.  (T. at 240-245.)  Plaintiff continued to

smoke, despite Dr. Goswami's advice, and plaintiff complained of difficulty breathing, coughing,

and chest pain.  (*Id.*)  The diagnosis was COPD.  (*Id.*)

Plaintiff was also examined on January 19, 2001.  (T. at 246.)  Dr. Goswami's notes were

similar – he advised plaintiff to quit smoking since he continued to experience shortness of

breath and diagnosed plaintiff with COPD.  (*Id.*)

### 2.    Massena Memorial Hospital

#### a.    Emergency Room Visit – July 26, 1998

---

[12]  There are notes from March 9, 1999 and March 23, 1999, which do not contain any information about the source; however, in their briefs, counsel for plaintiff and defendant have identified these notes as Dr. Goswami's.  Dkt. No. 5 at 3, Dkt. No. 8 at 4.

[13]  The Court notes that Robert Kasulke, M.D. conducted a consultative evaluation of plaintiff on January 11, 1999.  (T. at 161-162.)  Dr. Kasulke's examination included an x-ray of plaintiff's chest and a pulmonary function test.  (T. at 161-175.)  Dr. Kasulke's overall impression was similar to Dr. Goswami's diagnosis of COPD.  (T. at 162.)

On July 26, 1998, plaintiff was treated by the Emergency Room Department of Massena Memorial Hospital.  (T. at 152.)  Plaintiff arrived at the emergency room complaining of difficulty breathing, which he had been experiencing for approximately one week.  (T. at 154.)  Upon examination, a nurse heard wheezing bilaterally, which decreased with time.  (*Id.*)  A chest x-ray was also taken and Susanne Daye, M.D., a radiologist, stated that plaintiff's lung fields were hyperinflated and the diaphragms flattened, which were consistent with COPD.  (T. at 156.)

At the emergency room, plaintiff was also treated by Rosemary Heisse, M.D.  (T. at 158.)  Plaintiff complained to Dr. Heisse of shortness of breath, which had been getting progressively worse for several days, and was "severe" on the evening plaintiff went to Massena Memorial Hospital.  (*Id.*)  Plaintiff's symptoms included external dyspnea, orthopnea,[14] a non-productive cough, fever, chills, sinus drainage, nausea, and headache.  (*Id.*)  Dr. Heisse also noted that plaintiff had been seen and/or treated by his treating physician, Dr. Goswami, on July 21 for bronchitis.  (*Id.*)  Dr. Heisse further noted that plaintiff had previously had bronchitis and pneumonia, and a history of emphysema, but not severe shortness of breath.  (T. at 158.)  Dr. Heisse also indicated that plaintiff was a smoker.  (*Id.*)

Upon examination, plaintiff had decreased air movement, rhonchi, and wheezing.  (T. at 159.)  Plaintiff was "much improved after 1st 2 treatments" and no longer felt any shortness of breath, although plaintiff's wheezing persisted.  (*Id.*)  Plaintiff looked better and refused to be admitted.  (*Id.*)  Dr. Heisse's clinical impression was that plaintiff had acute exacerbation of COPD and possible pneumonia.  (*Id.*)

---

[14] Orthopnea is defined as "dyspnea that is relieved by assuming an upright position."  Dorland's Illustrated Medical Dictionary 1327 (30th ed. 2003).

b.    Emergency Room Visit – March 22, 1999

On March 22, 1999, plaintiff went to the emergency room at Massena Memorial Hospital after experiencing shortness of breath after being exposed to adhesive glue.  (T. at 195.)  Plaintiff was also treated by Dr. William Macklin, who noted that plaintiff denied any fever, chills, nausea, vomiting, cough, or chest pains.  (T. at 198.)  Dr. Macklin diagnosed plaintiff with bronchospasm, and prescribed rest, no tobacco, and continuation of medications.  (T. at 198, 202.)  Plaintiff arrived at the emergency room around 2:30 p.m. and was discharged around 4:10 p.m. with good breath sounds and no shortness of breath.  (T. at 197.)

3.    **Judith Bodnar, M.D. and Alan Auerbach, M.D.**

On February 11, 1999, Dr. Bodnar completed a RFC Assessment of plaintiff.  (T. at 182-189.)  This RFC Assessment was affirmed by Dr. Auerbach on April 9, 1999.[15]  (T. at 189.)  It appears that neither Dr. Bodnar nor Dr. Auerbach examined plaintiff.[16]  Dr. Bodnar indicated that plaintiff had no exertional, postural, manipulative, visual, or communicative limitations.  (T. at 183-186.)  In other words, plaintiff had an unlimited ability to, *inter alia*, lift and carry, stand, walk, sit, push and pull, climb, balance, stoop, kneel, crouch, and crawl.  (T. at 183-184.)  Dr. Bodnar stated that while plaintiff had no limitations regarding extreme cold or heat, wetness, noise, vibration, or machinery or height hazards, plaintiff should "avoid concentrated exposure" to humidity, fumes, dusts, odors, gases, and areas of poor ventilation.  (T. at 186.)  Dr. Bodnar's

---

[15]  Because Dr. Bodnar's opinions were affirmed by Dr. Auerbach, any reference in this Report and Recommendation to Dr. Bodnar's opinions also includes those of Dr. Auerbach.

[16]  This is based upon the fact that the table of contents accompanying the Administrative Transcript and defendant's brief identify Drs. Bodnar and Auerbach as non-treating, non-examining state agency physicians.  (T. at 2, Dkt. No. 8 at 4.)

conclusions were based on plaintiff's mild to moderate COPD.  (*Id.*)

## IV.  DISCUSSION

### A.    Duty to Develop the Record and Residual Functional Capacity

"It is the rule in [the Second C]ircuit that 'the ALJ, unlike a judge in a trial, must . . .

affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits

proceeding,' even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774

(2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) and *Echevarria v.

Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  The ALJ has the duty

to develop the record and seek out further information where physicians' reports are inconsistent

and where gaps exist in the record.  *Peterson v. Barnhart*, 219 F. Supp. 2d 491, 494-95

(S.D.N.Y. 2002) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).  However, where the

ALJ has a "complete medical history, the ALJ is under no duty to seek additional information

before rejecting a claim." *Peterson*, 219 F. Supp. 2d at 495 (citing *Rosa*, 168 F.3d at 79, n.5

(other citations omitted)).

At the outset, the Court notes that the Appeals Council specifically vacated the ALJ's

January 11, 2000 decision because the hearing decision did not contain an evaluation of Dr.

Goswami's November 1, 1999 RFC Assessment and Dr. Bodnar's February 11, 1999 RFC

Assessment, as affirmed by Dr. Auerbach on April 9, 1999.  (T. at 224.)  Furthermore, the

Appeals Council noted that in Dr. Goswami's November 1, 1999 RFC Assessment, he opined

that plaintiff was unable to perform sedentary work, but failed to provide any evidence in support

of his opinion.  (*Id.*)  Thus, the Appeals Council concluded that further development from Dr.

Goswami was required.  (*Id.*)

17

Upon remand, the Appeals Council directed the ALJ to give "further consideration to the treating source's opinion . . . and the nonexamining source's opinion . . . and explain the weight given to such opinion evidence.  As appropriate, the [ALJ] may request the treating and examining source to provide additional evidence and/or further clarification of the opinion and medical source statements about what the claimant can still do despite the impairment."  (T. at 224-225.)  At plaintiff's March 8, 2001 hearing, the ALJ specifically held the record open for an updated RFC Assessment and any other medical evidence to support plaintiff's claim of disability.  (T. at 89.)  An updated RFC Assessment by Dr. Goswami, dated March 20, 2001, was submitted.  (T. at 247-251.)

Despite the Appeals Council's directions and the submission of an updated RFC Assessment, the ALJ nonetheless failed to even mention Dr. Goswami's March 20, 2001 RFC Assessment.  Although the updated RFC Assessment was submitted after the hearing, it was submitted prior to the ALJ's issuance of his decision and should have been considered and evaluated by the ALJ.  Accordingly, because the ALJ failed to follow the directives of the Appeals Council and give further consideration to Dr. Goswami's updated opinions, remand is recommended.

Upon remand, in evaluating the opinions of Dr. Goswami and Drs. Bodnar and Auerbach, if further development of the evidence in support of their opinions is necessary, the ALJ will presumably procure such evidence.  It is noteworthy that the Appeals Council also mentioned that Dr. Goswami provided no evidence in support of his opinions, as contained in his November

18

1, 1999 RFC Assessment and thus further development was required.[17]  In this regard, Dr.

Goswami's RFC Assessments of plaintiff are incomplete.  When asked what medical findings

support his assessment of plaintiff's ability to perform work-related activities, Dr. Goswami did

not detail the medical findings that supported plaintiff's limited abilities; he only wrote "x ray,

PFT, clinical exam" in response to one question and provided nothing further.  (T. at 191-194,

248-250.)  In both the November 1, 1999 and the updated March 20, 2001 RFC Assessments, Dr.

Goswami did not set forth the dates, results, or assessments of the x-ray(s), pulmonary function

test(s), or clinical exam(s).  (*Id.*)  Furthermore, the other RFC Assessment contained in the record

(authored by Dr. Bodnar, as affirmed by Dr. Auerbach) contradicts Dr. Goswami's opinion.[18]

(*Id.*)  On the other hand, Dr. Robert Kasulke's impression of plaintiff, following a consultative

examination, was similar to Dr. Goswami's diagnosis of COPD.  *See* footnote 13 above.  Upon

remand these gaps and inconsistencies in the record presumably will be addressed.

It is also possible that the records from plaintiff's treating physician may be incomplete;

plaintiff's first examination by Dr. Goswami was on July 20, 1998 (T. at 178, 190).  However,

there are no medical records or notes by Dr. Goswami from July 20, 1998 until September 4,

1998 (T. at 178) contained in the Administrative Transcript.  Upon remand it is presumed the

---

[17]  As noted above at 10-11, Dr. Goswami's first RFC Assessment, which was unsigned and undated, was blank with regard to plaintiff's ability to perform work-related activities.  (T. at 176-179.)  In addition, a page of the form was missing from the record.  According to the Appeals Council, Dr. Gowami's second RFC Assessment, completed on November 1, 1999, did not provide any evidence in support of his opinion that plaintiff was unable to perform sedentary work.  (T. at 224.)  Dr. Goswami completed his third RFC Assessment, on March 20, 2001, very similarly to his second one.  In other words, the Court has compared the two assessments (which were completed) and Dr. Goswami did not provide any further explanation in his revised 2001 RFC Assessment; his comments are very similar to those set forth in 1999.  (*Compare* T. at 190-197 *with* T. at 247-251.)

[18]  Drs. Bodnar and Auerbach opined that plaintiff had the unlimited ability to lift and carry, stand, walk, sit, push and pull, climb, balance, stoop, kneel, crouch, and crawl.  (T. at 183-184.)

19

ALJ will clarify whether additional medical records exist for the period of July 20 to September 4, 1998, a time period in which plaintiff is claiming he is disabled.

### B.    Treating Physician

Plaintiff argues that the ALJ's assignment of "little probative weight" to Dr. Goswami's opinions was in error.  (Dkt. No. 5 at 13-17.)  Defendant argues that Dr. Goswami's opinions were not supported by the medical evidence, nor were they consistent with other evidence contained in the record, and thus the ALJ correctly accorded Dr. Goswami's opinions little weight.  (Dkt. No. 8 at 12.)

The medical opinions of a treating physician[19] are given "controlling weight" as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with other substantial evidence contained in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2005).  In *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004), the Second Circuit recently provided the following guidance:

> [T]he opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record"); 20 C.F.R. § 404.1527(d)(2).  Here, the key medical opinions submitted by Dr. Elliott to the ALJ were not particularly informative and were not consistent with those of several other medical experts.  Thus, Dr. Elliot's opinion as the treating physician does not sustain controlling weight.

*Halloran v. Barnhart*, 362 F.3d at 32.  Here, as stated above, the medical opinions rendered by

---

[19]  "Treating source" is defined as one's own physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the patient/plaintiff/claimant.  20 C.F.R. § 404.1502 (2005).

Dr. Goswami "were not particularly informative and were not consistent with those of" Drs. Bodnar and Auerbach.  Thus there is some support for the ALJ's decision not to give controlling weight to Dr. Goswami's opinions.

However, "[a]n ALJ who refuses to give controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Id.*  These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2) (2005).

Since, as noted above, this Court recommends remand, we further recommend remand on both prongs of the treating physician rule, *i.e.*, (1) what is the supporting basis for not affording controlling weight to Dr. Goswami's opinions, and (2) based upon the "factors" set forth above, how much weight, if any, should be given to his opinions?[20]

---

[20]  In declining to afford controlling weight to Dr. Goswami's conclusions, the ALJ stated, *inter alia*, that: (1) Dr. Goswami's treatment records fail to reveal the type of significant clinical and laboratory abnormalities one would expect for an individual with such severe limitations; and (2) the course of treatment pursued by Dr. Goswami was not consistent with what one would expect for someone with such severe limitations.  In this regard, the ALJ appears to have improperly substituted his own judgment for Dr. Goswami's medical opinion.  An "'ALJ cannot arbitrarily substitute his [or her] own judgment for competent medical opinion.'" *Torregrosa*, Civ. No. 03-5275, 2004 WL 1905371, at *4 (E.D.N.Y. Aug. 27, 2004) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) and *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)).  As a lay person, the ALJ was not in a position to determine what clinical and laboratory abnormalities were required for a person complaining of symptoms similar to plaintiff's.  Furthermore, the ALJ was not in a position to determine whether the course of treatment by Dr. Goswami was or was not sufficient for someone with plaintiff's symptoms and limitations.  *Rosa v. Callahan*, 168 F.3d at 79.  It is noteworthy that Dr. Robert Kasulke's overall impression was similar to Dr. Goswami's diagnosis of COPD.  *See* footnote 13 above.  These issues need to be addressed upon remand.

C.      **Pain/Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective

medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must

set forth his or her reasons 'with sufficient specificity to enable us to decide whether the

determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651

(N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, Civ. No. 96-9435, 1999 WL 185253, at *5

(S.D.N.Y. Mar. 25, 1999)).

To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on

a two step analysis of pertinent evidence in the record.  20 C.F.R. §§ 404.1529, 416.929 (2005);

*see also Foster v. Callahan*, Civ. No. 96-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the

medical impairments "could reasonably be expected to produce the pain or other symptoms

alleged . . . ."  20 C.F.R. §§ 404.1529(a), 416.929(a) (2005).  Second, if the medical evidence

alone establishes the existence of such impairments, then the ALJ need only evaluate the

intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to

which it limits the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929(c) (2005).

When the objective evidence alone does not substantiate the intensity, persistence, or

limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's

subjective complaints by considering the record in light of the following symptom-related

factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of

claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness,

and side effects of any medication taken to relieve symptoms; (5) other treatment received to

22

relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2005).  The Court notes that an ALJ's evaluation of a plaintiff's credibility is entitled to great deference if it is supported by substantial evidence. *Murphy v. Barnhart*, Civ. No. 00-9621, 2003 WL 470527, at *10 (S.D.N.Y. Jan. 21, 2003) (citing *Bischof v. Apfel*, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999) and *Bomeisl v. Apfel*, Civ. No. 96-9718, 1998 WL 430547, at *6 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's credibility . . . and such findings are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing.")).

Because this Court is recommending remand for further evaluation, the Court also recommends remand for clarification regarding plaintiff's credibility, consistent with the legal principles set forth above.  In addition, we note that the ALJ specifically stated that a factor influencing his decision to discredit plaintiff's description of his symptoms and limitations was the plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing. [The ALJ] carefully observed the [plaintiff] and notes that he was not in any obvious discomfort throughout the course of the hearing.  He lacked the general physical appearance of an individual who might have been experiencing prolonged or severe symptoms."  (T. at 19.)  While the Court acknowledges the deference to be afforded to the ALJ's evaluation of plaintiff's credibility, the Court is also cognizant of the Second Circuit's rejection of the "sit and squirm" test as a basis for rejecting pain.  *Aubeuf v. Schweiker*, 649 F.2d 107, 113 n.7 (2d Cir. 1972); *Neilen v. Apfel*, Civ. No. 96-0435, 1998 U.S. Dist. LEXIS 4321, at *6 (N.D.N.Y. Feb. 3, 1998).  Thus, to the extent

23

that the ALJ considered plaintiff's lack of "obvious discomfort," this is not only a basis for remand for further evaluation regarding plaintiff's credibility, but also forms a basis for remand because the ALJ may have substituted his own opinion for that of a medical expert. *Aubeuf*, 649 F.2d at 113 n.7 (quoting *Tyler v. Weinberger*, 409 F. Supp. 776, 789 (E.D. Va. 1976) ("[A] 'sit and squirm' index . . . applied by a judge who is not a medical expert will not only result in unreliable conclusions when observing claimants with honest intentions, but may encourage claimants to manufacture convincing observable manifestations of pain or, worse yet, discourage them from exercising their right to appear before an Administrative Law Judge for fear that they may not appear to the unexpert eye to be as bad as they feel.").

### D.      Past Relevant Work

As stated above, this Court is recommending remand for further evaluation of plaintiff's RFC; thus it follows that remand to determine whether plaintiff could perform his past relevant work is necessary.  At the fourth step of the sequential evaluation, a claimant's RFC and past relevant work are considered.  20 C.F.R. § 404.1520(a)(4)(iv) (2005).  Specifically, the regulations state that "we [the SSA] will compare our residual functional capacity assessment . . . with the physical and mental demands of your past relevant work."  20 C.F.R. § 404.1520(f) (2005).

Upon remand, the Court presumes that the ALJ will evaluate the opinions of Drs. Goswami, Bodnar, and Auerbach, procure all necessary evidence, and make a finding regarding plaintiff's RFC.  After that finding is made, pursuant to the regulations, it will be compared to plaintiff's past relevant work to see if he is capable of performing this kind of work.

Accordingly, because remand is necessary in order to re-evaluate plaintiff's RFC, remand

24

is also necessary to determine whether plaintiff retains the RFC to perform his past relevant work.

## V.      REMAND OR REVERSAL

When there are gaps or inconsistencies in the administrative record, with no sufficiently complete proof that the plaintiff is disabled, the appropriate relief is remand for further or proper evaluation of the record.  *Rosa v. Callahan*, 168 F.2d at 82-83.  Here, there clearly are gaps and inconsistencies in the record, including the ALJ's inexplicable failure to even consider Dr. Goswami's RFC Assessment of March 30, 2001.  Thus, for these and the other reasons stated above, this case must be remanded for further evaluation.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[21] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 25, 2005
        Syracuse, New York

George H. Lowe
United States Magistrate Judge

---

[21]  Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (2005).